Per Curiam :
This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on September 20, 1965. Exceptions to the commissioner’s report, findings and recommended conclusion of law were filed by plaintiff and defendant excepted to a statement in the commissioner’s opinion. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court is in agreement with the opinion, findings and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiff is therefore not entitled to recover end the petition is dismissed on its petition filed on July 26,1961, and the case is remanded to the trial commissioner for further proceedings on plaintiff’s motion to amend the petition.†
Commissioner Fletcher’s opinion, as modified by the court,* is as follows:
It has been said that:
Of all the areas of executive decision, pricing is perhaps the most fuzzy. Whenever a price problem is discussed * * *, divergent figures are likely to be recommended without a semblance of consensus. [Oxenfeldt, Multi-stage Approach to Pricing, 38 Harv. Bus. Beview 125 (July, August 1960) ]
This novel and difficult case presents a study in that “fuzzy” area of pricing. The taxpayer, hereinafter referred to as “Eli Lilly,” has adopted a pricing policy on its products destined for international markets which results in its selling-organizations receiving the bulk of the overall profits from sales abroad. That policy disturbs the Government only insofar as it involves Eli Lilly’s products sold in the Western Hemisphere (other than the United States). Because one *669 of Eli Lilly’s selling subsidiaries qualifies as a Western Hemisphere trade corporation, and therefore enjoys a reduced rate of tax on its income, the Government asserts that Eli Lilly’s pricing policy results in tax avoidance and does not clearly reflect the incomes of the related organizations. Accordingly, the Government has endeavored to counter Eli Lilly’s pricing policy by making use of a relatively compact section of the Internal Eevenue Code of 1954 containing words of delusive simplicity. It reads in its entirety as follows:
SEC. 482. ALLOCATION OP INCOME AND DEDUCTIONS AMONG TAXPAYERS.
In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. (26 U.S.C. 1958 ed., Sec. 482.)[1]
Before describing the manner in which the Commissioner of Internal Eevenue has allocated income between Eli Lilly and its subsidiaries, it is necessary to review briefly the history and development of Eli Lilly’s international trade including a description of the methods adopted by the company for conducting such foreign business during the years at issue, 1952 through 1957.
Eli Lilly is an Indiana corporation. It is a long-established and well-known manufacturer and seller of pharmaceuticals, biologicals, and related products, including certain agricultural and industrial products of a similar nature.[2] Prior to 1940, the management of Eli Lilly appears to have *670 given only sporadic attention to the development of a significant international market for Lilly products. During 1940, however, J. K. Lilly, Jr., who was head of domestic marketing, assumed responsibility for export sales also. He initiated studies to determine what could be done to improve Eli Lilly’s position in foreign markets. One result was the formation within Eli Lilly of an Eastern Hemisphere sales division and a Western Hemisphere sales division. That method of organization proved unsatisfactory because company personnel continued to devote their major energies to domestic matters and tended to treat the new international divisions as stepchildren.
By June of 1943, Mr. Lilly had decided that the best way to develop the international market was through subsidiary corporations. Whereupon, Eli Lilly formed under the laws of Indiana two wholly-owned subsidiaries, Eli Lilly International Corporation (International) to service business in the Eastern Hemisphere and Eli Lilly Pan-American Corporation (Pan-American) to service foreign business in the Western Hemisphere.[3] Eli Lilly personnel with prior experience in the respective hemispheres were placed in charge of the new corporations.
The matter of pricing Lilly products to the new subsidiaries was then made the subject of extensive consideration. Following discussions and studies of numerous unique factors applying to sales of pharmaceuticals in foreign markets, Eli Lilly’s management decided to price its products to International and Pan-American on what is best described as an incentive or motivation basis. A very substantial discount off domestic prices, increasing with volume, was applied to sales to the subsidiaries with the thought that such favorable treatment would be an incentive to expansion and growth of the foreign markets. The original agreements in this respect are more fully described in finding 17, infra.
These original intercompany arrangements were worked out by Eli Lilly’s management primarily for what it considered to be sound business reasons. At first, no consideration *671 appears to have been given to the subject of taxes. However, in February 1944, the subject was considered, and an application was made to the Commissioner of Internal Revenue for a ruling as to Pan-American’s status under the Western Hemisphere trade corporation provisions of the 1939 Code. Based on the facts submitted, the Commissioner issued a favorable ruling to Pan-American.
No significant change in the above arrangements occurred until 1946. In that year it was decided to change the merchandise flow to foreign markets. Instead of selling directly to its several subsidiaries, Eli Lilly decided to use International as its exclusive distributor for export of its products throughout the world. Under this new arrangement, all merchandise destined for export was purchased from Eli Lilly by International and sold by the latter either to Pan-American, to other subsidiaries, or directly to unrelated wholesalers in the Eastern Hemisphere. The pricing policy adopted on sales to International was a discount of 60 percent from domestic prices on finished and packaged merchandise, and at Eli Lilly’s cost plus 15 percent on bulk merchandise.
That pricing policy continued through 1948, when, during an audit of Eli Lilly’s tax returns, the Internal Revenue Service first proposed to reallocate income of International and Pan-American to Eli Lilly. This dispute involving earlier years was compromised, and for 1949, 1950, and 1951 Eli Lilly transferred merchandise to International and prepared its tax returns on the basis of that settlement for the earlier years.
In the year 1952 Eli Lilly reexamined its position on pricing to International. It had become apparent that Pan-American and International were finding it difficult to make profits. Prices were demoralized in the antibiotic field and, streptomycin was being purchased by Eli Lilly and sold at a loss because of its difficulties in manufacturing that product. Also, there was a continuing tax problem under section 45 of the 1939 Code (now section 482 of the 1954 Code, supra), and the company’s accountants and tax attorneys told management that the existing pricing arrangement flowing from *672 the settlement described above bad placed Eli Lilly at a substantial disadvantage taxwise with respect to the rest of the industry. Accordingly, studies were made during the year 1952 and advice was obtained to determine what action should be taken with respect to the transfer price from Eli Lilly to International. This study was participated in by the highest management officials of Eli Lilly. They found that if Eli Lilly continued to price on the basis of the composite average which it had used during the years 1949, 1950, and 1951, resulting from the earlier settlement, International and Pan-American would have operated at losses during the year 1952.
The pricing policy finally established for the year 1952 differed somewhat from the policy which had been used in the years 1944 through 1948. The price arrangement which had been in effect from 1944 through 1948 had been considered in terms of a discount off domestic net trade prices which was the common denominator at that time in maintaining inventory controls. The price which was determined in 1952 was a cost-oriented price which made no provision for a specific monetary profit to Eli Lilly. All sales by Eli Lilly to International under this policy were priced to effect a recovery of the manufacturing cost of goods sold, plus royalties payable by Eli Lilly to third parties, plus all operating expenses incurred by Eli Lilly incident to the servicing of the export business.
This management decision took into consideration all of the factors which were considered originally in 1943 and 1944 in determining the appropriate prices to International and to Pan-American but with the benefit of the experience that had been obtained since 1944 in conducting export operations. It also took into consideration the continuing tax problem under section 45 referred to above.
Under this policy, all merchandise was transferred to International at the same price regardless of whether the final destination of the merchandise was to be in the Eastern Hemisphere or in the Western Hemisphere. However, International’s price policy for goods purchased by it from Eli Lilly was different with respect to goods destined for the Eastern Hemisphere as compared to those destined for the Western Hemisphere. International had many wholesale *673 distributors located in the Eastern Hemisphere, and it sold Lilly products to those distributors at the “Interex” net trade price less 15 percent. The Interex net trade price was approximately the same as the domestic net trade price being the suggested price to the retailer.
All products destined for foreign countries in the Western Hemisphere, however, were sold by International to its sister, Pan-American. On these sales International priced to Pan-American on a basis designed to effect a recovery of International’s cost of goods sold, plus allocable administrative and selling expenses attributable to sales to Pan-American as determined by International’s accountants. That allocation of expenses was based on a 3-factor formula which took into account total sales of the two companies and their total number of distributors and sales representatives. As in the case of sales by Eli Lilly to International, no provision was made for a specific monetary profit to International on its sales to Pan-American.
It is obvious, of course, that one result of the above-described intercompany pricing method was to assemble in Pan-American nearly all the taxable income derived from sales of Lilly products in foreign countries within the Western Hemisphere. Since Pan-American was entitled as a qualified Western Hemisphere trade corporation to the preferential treatment conferred on such corporations by sections 921-922 of the 1954 Code, the resulting tax advantage flowing to the affiliated corporate group from such pricing method is equally obvious.
But, says Eli Lilly, there is nothing wrong in this. It vigorously asserts, and on this record has satisfactorily proved, that sound business reasons primarily motivated its pricing policy on goods destined for foreign markets. Accordingly, it insists that any resulting tax advantage is nothing more than was intended by Congress when it enacted the Western Hemisphere trade corporation provisions of the Internal Revenue Code referred to above.
The Government disagrees. It does not dispute Eli Lilly’s right to organize internally in any way company management may desire, nor does it question Pan-American’s status as a qualified Western Hemisphere trade corporation. But for *674 tax purposes, says the Government, section 482, supra, and the regulations issued thereunder, require it to intervene and determine the “true taxable income” of each of the controlled group. The regulation to which the Government points is section 1.482-1 of Treasury Regulations on Income Tax (26 C.F.R. Sec. 1.482-1) which reads, in pertinent part:
(b) Scope and pwrpose. (1) The purpose of section 482 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, and the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, credits, or allowances, or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm’s length with another uncontrolled taxpayer.[4]
During the course of his audits covering the 1952 through 1957 tax returns of Eli Lilly, International, and Pan-American, an Internal Revenue agent became convinced that Eli Lilly’s intercompany pricing arrangements did not clearly reflect the respective taxable incomes of the related organizations and resulted in unwarranted tax avoidance. He decided that section 482, the above-quoted regulation, and Rev. Rul. 15, 1953-1 C.B. 141, required him to allocate items affecting taxable income between the controlled taxpayers in an effort to determine their true taxable incomes. His task under the above regulation, as he saw it, was to determine what Eli Lilly’s prices would have been if its sales of Lilly products to International had been made at arm’s length instead of *675 to a controlled subsidiary. For this purpose he adopted as a measuring stick Eli Lilly’s profit experience on its domestic sales to its uncontrolled wholesale distributors. On the basic assumption that the same profit earned by Eli Lilly on its domestic expense dollars should be earned by it on its foreign trade expense dollars, he first computed the percentage figure which Eli Lilly’s net income from domestic sales bore to its expenses on those sales. He reasoned that, if International’s cost of goods purchased from Eli Lilly were increased by such percentage figure, the results under the intercompany agreements would be (1) to increase Eli Lilly’s sales (and thereby its taxable income) in a like amount and (2) to increase Pan-American’s cost of goods purchased from International (thereby decreasing Pan-American’s taxable income) in a like amount.
However, in discussing the matter with Eli Lilly’s representatives, the agent became aware of certain flaws in his basic assumption that Eli Lilly should earn the same profit on its sales to International as it earned on its domestic sales to wholesale distributors. It became apparent to him that the sales were not entirely comparable, the major difference being that International was one large customer to whom Eli Lilly could be expected to sell its goods in quantity at a lower profit than to its numerous domestic wholesalers.
In an effort to take this difference into account, the agent did something to which Eli Lilly points, among other things, as clear proof of arbitrary and unreasonable action. He simply applied one-half of Eli Lilly’s profit percentage for domestic sales to the cost of goods sold to International. However, he applied the full percentage to the allocated expenses.[5] His only explanation for cutting the percentage figure in half when applied to cost of goods sold was to the effect that Eli Lilly’s representatives had agreed with him that such reduction fairly reflected International’s status as a single large customer. However, while the record shows earnest efforts were made to arrive at a settlement, it shows equally that Eli Lilly’s representatives did not agree with any *676 of the agent’s theories of reallocation and, indeed, consistently contended that no reallocation at all was required or permissible under the law. It appears that the agent misinterpreted the nature of tentative concessions made in the course of exploring settlement possibilities. In any event, although the above-described adjustments (and all others) made by the agent to his computed profit percentages were concessions in Eli Lilly’s favor, it has seized upon them as demonstrating that his entire method of allocation (which was ultimately reflected in the Commissioner’s deficiency notices) was arbitrary and based on subjective considerations with no discernible standards.
There is some merit to Eli Lilly’s complaint in this respect, for it is apparent that a taxpayer subjected to a section 482 allocation will be severely handicapped in opposing any method of allocation where it contains a subjective element such as merely cutting a computed percentage figure in half. The difficulty with this contention is that, whatever criticism may be directed to the agent’s methodology, Eli Lilly has failed, in my judgment, to prove that he arrived at an unreasonable result. As the Tax Court has said in analyzing a section 482 (then section 45) allocation:
Although the method of allocation used by the respondent, based on the gross income of each company, might appear to be arbitrary, we can not say, on any evidence before us, that it led to arbitrary and unreasonable results. Our concern is more with the ultimate results arrived at by the Commissioner than the methods which he uses. [Leedy-Glover Realty and Insurance Co., 13 T.C. 95, 107 (1949)].
The reasonableness of the result of the reallocation in this case seems to me apparent from a comparison of total book profits enjoyed by the three companies on sales of Lilly products in the Western Hemisphere both before and after the reallocation. This comparison is shown in graphic form in finding 59, infra. It shows that, during the six years involved, prior to the reallocation, Pan-American received a share of the total profits from Western Hemisphere sales ranging from 92.84 percent to 97.68 percent; Eli Lilly’s share of such profits ranged from 0.61 percent to 5.65 percent; and International’s share ranged from 0.70 percent to 2.08 per *677 cent. After the reallocation, Pan-American’s share of such profits was still high and ranged from 62.07 percent to 74.56 percent, while Eli Lilly’s share had increased to a range of from 22.90 percent to 28.30 percent, and International’s share ranged from 0.53 percent to 9.63 percent.
Hence, the lion’s share of the profits from Western Hemisphere sales remained in Pan-American even after the reallocation, and to this extent it continues to enjoy (as it properly should) the tax benefits which flow from its Western Hemisphere trade corporation status. To accept Eli Lilly’s contention that this is not enough, and that its cost-oriented pricing policy must be accepted, would require the court to ignore the provisions of Treas. Reg. 1.482-1, supra, which states that the standard to be applied in a section 482 allocation is that of “an uncontrolled taxpayer dealing at arm’s length with another uncontrolled taxpayer.” It must surely be obvious that, if International were an “uncontrolled” purchaser from Eli Lilly, it would not have been able to buy Lilly products for the prices paid by it in this case. It is equally obvious that, being a large volume purchaser, an “uncontrolled” International could expect to buy Lilly products at prices somewhat less than the suggested retail price minus 15 percent paid by Lilly’s domestic wholesale distributors. But, how much less % The revenue agent roughly split the difference, and Eli Lilly justifiably complained of such subjectivity. Yet, in electing simply to defend its cost-oriented pricing policy to its subsidiary, Eli Lilly has failed to meet its admittedly difficult burden of proving what it would have charged a volume purchaser, such as International, if it were an “uncontrolled” purchaser. In a refund suit such as this, the taxpayer in order to prevail must go further than proving arbitrary action by the Commissioner of Internal Bevenue. In addition, the taxpayer must prove the correct amount of the tax and resulting overpayment. Helvering v. Taylor, 293 U.S. 507 (1935); Lewis v. Reynolds, 284 U.S. 281 (1932); United States v. Pfister, 205 F. 2d 538 (8th Cir., 1953). See, also, Plumb and Kapp, Reallocation of Income and Deductions Under Section 482, 41 Taxes 809, 830 (December 1963).
*678 Eli Lilly appears to recognize its burden in this respect but insists that it has fully carried that burden by proving the arm’s-length character of its sales to International. It points to sizable sales made during the period involved to unrelated purchasers of Lilly products in bulk form. Those unrelated purchasers were industrial or agricultural consumers and the Defense Procurement Agency of the United States Government. In several instances, sales were made to those purchasers at prices less than were being charged to International, and Eli Lilly contends that such bulk sales were much more comparable to its sales to International than were the sales used by the revenue agent for comparison, i.e., the sales to domestic wholesalers. In showing such admittedly arm’s-length sales at prices less than the International sales, Eli Lilly insists that it has borne its burden of proving that no allocation whatever was permissible under section 482.
Crucial to this argument, of course, is the assertion of comparability between sales to International and to the aforesaid bulk purchasers. However, those sales were not sufficiently comparable to establish an arm’s-length criterion. In contrast to the foreign market, the bulk market was secondary, or marginal, and provided a convenient outlet for surplus capacity. Eli Lilly utilized such capacity by bidding low for Defense Procurement Agency and industrial contracts on a well-known theory used in pricing products at lower figures for a marginal market. (See finding 47.) The Government market was also marginal in that sales made to the Government were, as described by Eli Lilly’s president, “casual” in contrast to the regular and continuing sales made in the foreign market. Such sales also differed in that they comprised raw chemicals, semi-processed and finished drugs in large drums without an identifying trademark, whereas sales to International for the most part were in the form of finished and packaged goods with the Lilly trademark affixed, as was true in the case of domestic sales.
Sales made to International were tailored into the production planning of Eli Lilly. Unlike the casual bulk sales market, the foreign market was under consistent development and promotion by the responsible executives at Eli Lilly. From *679 the time in 1940 that J. K. Lilly, Jr. assumed responsibility for the export sales division and initiated a study to determine the proper method of organization for international trade, Eli Lilly sought to cultivate the growth of its international operations. The keen interest in this market continued through the years at issue. (See findings 12-22.) It is clear that management viewed the sales made to International for the foreign market as an important and integrated part of the entire Eli Lilly production operation. Consequently, this market was not marginal in nature. It was more comparable to the domestic market generally even though not as large.
In its briefs Eli Lilly places great emphasis on the importance of the many business reasons which motivated its intercompany pricing policies. There is no doubt that the record here clearly establishes the existence of sound and well-considered business reasons for the pricing policies adopted. The myriad details are spelled out in findings 16, 18, 19, 23, 30, and 31, infra. There is also no doubt that serious consideration was given to the “continuing tax problem” under section 45, now section 482, and surely management would have been considered derelict in its duties if it had not considered such an important problem. Nonetheless, there is ample credible testimony that the predominant reasons for Eli Lilly’s pricing policies were those connected with its management’s efforts to expand and develop the foreign market.
Eli Lilly’s eminent counsel argue, in effect, that this should be the end of the matter, that a finding of business motivation effectively removes section 482 from the Government’s arsenal. Consequently, they say, Eli Lilly’s “position is and has always been that no amount should be reallocated.” Reply Brief, p. 129.
I am unable to agree that the existence of valid and sound business purposes for intercompany arrangements will thus devitalize section 482. In another connection, this court has stated that no such dispositive effect will be accorded to a valid business reason for a given transaction. See Neff v. United States, 157 Ct. Cl. 322, 305 F. 2d 455 (1962), vacating *680 and withdrawing 157 Ct. Cl. 804, 301 F. 2d 330, cert. denied, 372 U.S. 913 (1963) where the court said at 157 Ct. Cl. 327:
Even assuming that the sole force motivating the redemption was, as plaintiffs contend, the desire to raise additional capital to support corporate operations, we would view the distribution as one by its nature essentially equivalent to a dividend. Although such motivation would undoubtedly constitute a valid corporate purpose, we do not find the presence of valid corporate purpose dispositive. Holsey et al. v. Commissioner of Internal Revenue, 258 F. 2d 865, 869 (1958) ; Northrup v. United States, 240 F. 2d 304, 307 (1957). While the absence of any valid corporate purpose as motivating the redemption might constitute substantial evidence indicating that the redemption distribution was essentially equivalent to a dividend, we do not believe that the presence of such corporate purpose establishes, per se, nonequivalence.
It will be recalled that section 482 states that its purposes are twofold. First, the Commissioner may resort to it “in order to prevent evasion of taxes.” Secondly, he may resort to it when ever he deems it necessary “clearly to reflect the income” of the related organizations. Here, the facts show that Eli Lilly’s shift to its subsidiaries of a part of the income which it had earned from its manufacturing operations was done predominantly for business reasons. Hence, the applicability of the first purpose mentioned above is dubious. However, the shift resulted in a failure to reflect clearly Eli Lilly’s income from manufacturing, and this is enough to warrant an allocation under section 482. It has been so held. Central Cuba Sugar Co. v. Commissioner, 198 F. 2d 214 (2d Cir., 1952), cert. denied, 344 U.S. 874; Dillard-Waltermire, Inc. v. Campbell, 255 F. 2d 433 (5th Cir., 1958). See, also, Plumb and Kapp, Reallocation of Income and Deductions Under Section 182, supra, at p. 813, and Hewitt, Section 482— Reallocation of Income and Deductions Between Related Persons — Up to Date, 22 N.Y.U. Ann. Inst. on Fed. Taxation 381, 395 (1964). In Dillard-Waltermire, supra, the court summarized the matter as follows:
The appellant undertook to prove absence of a tax motive in order to negative the claim of tax evasion. Even satisfactory proof of a business reason for the *681 transfer of these partially completed contracts to the identical interests freed of any obligation to bear the corporate tax would not be an answer to the Commissioner’s claimed right to make the allocation. The statute permits such allocation if the result more clearly reflects the true income of the related businesses. [At 486.]
In the light of the foregoing authorities, it is clear that a section 482 allocation was permissible in this case, regardless of Eli Lilly’s sound business reasons for its pricing policies.
In support of its position, Eli Lilly appears to place much reliance on the case of Frank v. International Canadian Corp., 308 F. 2d 520 (9th Cir., 1962). There a parent corporation sold goods to its Western Hemisphere trade corporation subsidiary at a price which included all the parent’s direct costs in producing the goods, a full allocation of manufacturing overhead, delivery charges, and a six percent markup on those costs and charges. The Commissioner asserted that a reallocation was necessary under section 45, now section 482, but the court found that the price reflected a “reasonable return” and therefore a reallocation of any part thereof was not proper. The provision in the price for a six percent profit obviously distinguishes the Frank case from the present one. However, Eli Lilly points to the following language in the court’s opinion as demonstrating that the arm’s-length standard set forth in the regulations is not the only test for determining true taxable income under section 482:
But entirely aside from appellees’ position that the Commissioner is precluded from advancing this argument on appeal, we do not agree with the Commissioner’s contention that “arm’s length bargaining” is the sole criterion for applying the statutory language of § 45 in determining what the “true net income” is of each “controlled taxpayer.” Many decisions have been reached under § 45 without reference to the phrase “arm’s length bargaining” and without reference to Treasury Department Regulations and Rulings which state that the talismanic combination of words — “arm’s length” — is the “standard to be applied in every case.”
For example, it was not any less proper for the district court to use here the “reasonable return” standard than it was for other courts to use “full fair value,” “fair price, including a reasonable profit,” “method which *682 seems not unreasonable,” “fair consideration which reflects arm’s length dealing,” “fair and reasonable,” * * * or “fair and fairly arrived at,” or “judged as to fairness,” all used in interpreting § 45. [At 528-9.]
The Ninth Circuit has since indicated that only a very narrow departure from the arm’s-length standard was allowed in the particular circumstances of Frank, and that where “the extent of the income in question is largely determined by the terms of business transactions entered into between two controlled corporations it is not unreasonable to construe ‘true’ taxable income as that which would have resulted if the transactions had taken place upon such terms as would have applied had the dealings been at arm’s length between unrelated parties.” Oil Base, Inc. v. Commissioner, 362 F. 2d 212, 214 (9th Cir., 1966), cert. denied, 385 U.S. 928. Moreover, even accepting Eli Lilly’s interpretation that Frank establishes a criterion of a fair and reasonable price, such a price can best be determined by hypothesizing to an arm’s-length transaction. The thrust of section 482 is to put controlled taxpayers on a parity with uncontrolled taxpayers. Consequently, any measure such as “fair and reasonable” or “fair and fairly arrived at” must be defined within the framework of “reasonable” or “fair” as among unrelated taxpayers. Simply because a price might be considered “reasonable” or “fair” as a -business incentive in transactions among controlled corporations, does not mean that unrelated taxpayers would so consider it. Thus, even if the arm’s-length standard is not the sole criterion, it is certainly the most significant yardstick.[6]
Finally, Eli Lilly contends that section 482 should not be applied to an intercompany pricing arrangement so as to deny *683 any of tlie benefits intended to be conferred on Western Hemisphere trade corporations by sections 921-922 of the 1954 Code. Thus far, it appears that no .court has been asked to decide this specific question. It has, however, been the subject of extensive commentary by experts in the general area of taxation on doing business abroad. Predictably, divergent viewpoints have resulted. See Baker and Baker, The Pricing of Goods in International Transactions Between Controlled Taxpayers, 10 Tax Executive 235 (April 1958); Craves, Problems in the Allocation of Foreign Income, 16 Tax Executive 284 (July 1964); Baker and Sarabia, The Function of Tax Incentives in International Trade, 26 Tulane L. Rev. 405 (1952); Plumb and Kapp, Reallocation of Income and Deductions Under Section 482, supra; Hewitt, Section 482 — Reallocation of Income and Deductions Between Related Persons — Up To Date, supra; Slowinski, Tax Planning For Foreign Subsidiary Operations, 17 N.Y.U. Ann. Inst. on Fed. Taxation 331 (1959); Brudno, The Practiced Aspects of Incorporating and Doing Business Abroad, 14 Univ. of So. Calif. Tax Inst. 345 (1962).
The basic problem is well stated by Plumb and Kapp, supra. They say:
It is in the area of intercompany pricing of products, on an international stage, that Section 482 is destined to play its next, and perhaps most significant, role. * * * $ $ ‡ $
The total exemption from United States corporate income taxes of foreign source income of some foreign subsidiaries of United States corporations, and the preferential tax treatment accorded certain domestic corporations engaged in international trade, provide a powerful incentive to tax conscious management to so arrange intercompany price structures as to maximize the earnings of those members of the corporate family which enjoy these benefits? at the expense of the others. * * * The possible variations are infinite.
In Section 482, the Commissioner has a powerful weapon for thwarting the plans of those who would thus minimize the taxes of an affiliated group. Although the authority which Section 482 confers upon the Commissioner is unquestionably adequate to permit him to deal with shifting of this sort, [the authors recognize a contrary view] and its general standard is easy *684 enough to state, the precise application of this provision to any given set of circumstances may present complex problems of accounting, economics, and proof. At 820-1.
I agree with the foregoing view that section 482 is available to the Government even though the resulting reallocation may have an effect on some benefits conferred by another section of the Code. Section 482 (and its predecessor) has been a part of the tax statute for many years. If Congress had intended to make it inapplicable to Western Hemisphere trade corporations, it would have been very simple to have said so at the time the original Western Hemisphere trade corporation provisions were enacted. That Congress did not do so is, of course, very significant. “The silence of Congress is strident.” Commissioner v. Beck's Estate, 129 F. 2d 243, 245 (2d Cir., 1942).
The Third Circuit Court of Appeals has stated the applicable principle in the following language :
Section 45 [now section 482] is directed to the correction of particular situations in which the strict application of the other provisions of the act will result in a distortion of the income of affiliated organizations. In every case in which the section is applied its application will necessarily result in an apparent conflict with the literal requirements of some other provision of the act. If this were not so Section 45 would be wholly superfluous. We accordingly conclude that the application of Section 45 may not be denied because it appears to run afoul of the literal provisions of Sections 112(b) (5) and 113 (a) (8) if the Commissioner’s action in allocating under the provisions of Section 45 the loss involved in this case was a proper exercise of the discretion conferred upon him by the section. [National Securities Corp. v. Commissioner, 137 F. 2d 600, 602 (3d Cir., 1943), cert. denied, 320 U.S. 794.]
Accordingly, it is clear that here the Commissioner was authorized to apply the provisions of section 482 despite the resulting impact on some of the benefits conferred by the Western Hemisphere trade corporation provisions of the Code.
For all of the foregoing reasons, it is recommended that the court enter its judgment for defendant and dismiss the plaintiff’s petition.
*685 FINDINGS of Fact
1. Plaintiff, Eli Lilly and Company (hereinafter referred to as “Eli Lilly”) was organized in 1876 and incorporated under the laws of the State of Indiana in 1901. It has its principal offices at 740 South Alabama Street, Indianapolis, Indiana. It is principally engaged in the manufacture and sale of pharmaceuticals, biologicals, and related products. Certain agricultural and industrial products are also produced and sold. The company formulates basic raw materials into pharmaceutical form, and itself manufactures about 50 percent of the raw materials used. During each of the years in issue, namely, 1952 through 1957, Eli Lilly made all its sales within the United States.
2. Eli Lilly filed with the District Director of Internal Revenue at Indianapolis, Indiana, its Federal income tax returns (Form 1120) for the calendar years 1952, 1953, 1954, 1955, 1956, and 1957, on an accrual basis, disclosing tax liabilities in the following amounts:
Calendar year 1952. $9,264,198. 05
Calendar year 1953. 11, 911, 063.39
Calendar year 1954. 9,243, 527. 38
Calendar year 1955. 15,199,143.97
Calendar year 1956. 26, 942,064.11
Calendar year 1957. 28, 631,736.86
Eli Lilly duly paid these amounts to said District Director for said years on various dates and in various installments.
3. On December 28, 1956, Eli Lilly executed Waivers of Restriction on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment (Form 870) for the calendar years 1952,1953, and 1954 which reflected deficiencies of tax in the amount of $1,444,660.10, together with interest in the amount of $244,948.17. Eli Lilly paid said deficiencies and interest on December 31, 1956, in the total amount of $1,689,608.27. On January 28,1958, the deficiencies for these years were redetermined, which redetermina-tions resulted in a refund of $112,132.68 of the amount of tax and interest paid December 31, 1956.
4. On November 7, 1958, Eli Lilly executed Waivers of Restriction on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment (Form 870) for the *686 calendar years 1955, 1956, and 1957 which, reflected deficiencies of tax in the amount of $2,333,909.20. On February 22, 1960, Eli Lilly paid said deficiencies together with interest thereon in the amount of $379,765.46, or a total of $2,713,-674.66.
5.On December 16, 1960, Eli Lilly filed with the District Director of Internal Eevenue at Indianapolis, Indiana, timely claims for refund of Federal income taxes for the calendar years 1952, 1953, 1954, 1955, 1956, and 1957 in the amounts set forth below plus interest thereon as provided by law:
Calendar year 1952- $278,770.75
Calendar year 1953_ 637,424. 96
Calendar year 1954_ 574,696.11
Calendar year 1955_ 599, 544.27
Calendar year 1956_ 1, 067, 678.74
Calendar year 1957_ 980,942.94
4,139, 057.77
Those claims raise the same issues as are involved in this suit. By certified letter dated March 16, 1961, the Commissioner of Internal Eevenue disallowed in full said claims for refund.
6. Eli Lilly International Corporation (hereinafter referred to as “International”) was organized under the laws of the State of Indiana in September 1943, and has its principal offices at 1202 Kentucky Avenue, Indianapolis, Indiana. All of the outstanding stock of International is owned by Eli Lilly. During all the years in issue, International was the exclusive distributor of products manufactured by Eli Lilly to all countries of the world outside of the United States.
7. Eli Lilly Pan-American Corporation, (hereinafter referred to as “Pan-American”) was also organized under the laws of the State of Indiana in September 1943, with its principal offices at 1202 Kentucky Avenue, Indianapolis, Indiana. All of the outstanding stock of Pan-American is owned by Eli Lilly. From 1943, and during each of the years in issue, Pan-American marketed products manufactured by Eli Lilly throughout the Western Hemisphere outside of the United States. During the years in issue, all of the products sold by Pan-American were purchased by it from International *687 in the United States and sold within the Western Hemisphere outside of the United States.
8. During the years in issue, all sales by Eli Lilly to International were priced to effect a recovery of the manufacturing cost of goods sold plus royalties payable by Eli Lilly to third parties plus an amount, as determined by Eli Lilly’s accountants, which was calculated to cover allocable operating expenses with respect to sales to International. The al-locable operating expenses of Eli Lilly attributable to its sales to International were determined in the following manner.
At the request of the Treasurer’s Office, the division directors of all divisions of Eli Lilly reported time and effort expended by their divisions in servicing intercompany volume, that is, sales to International. Upon receipt of this data from the division directors the accountants in the Financial Division evaluated it by summarizing from the books and records of the company specific expenses, total department costs, and with respect to certain departments, by apportioning departmental effort based upon the number of persons assigned or upon a percentage of total departmental effort involved, including cost of supervision and fixed charges applicable to the respective departments. The method used in determining allocable operating expenses was devised by the accountants in the Financial Division of Eli Lilly in 1946 at the request of the management in order to determine the operating expenses attributable solely to the inter-company volume. It does not appear that any effort was made by the accountants to allocate to International any of Eli Lilly’s costs or expenses (other than fixed costs) which Eli Lilly would have incurred irrespective of its sales transactions with International. The record establishes that Eli Lilly’s research and development costs would have been much the same whether or not it had made any sales to International. Accordingly, only relatively insignificant amounts of such costs were ever allocated to International.
9. During the years in issue, all sales by International to Pan-American were priced on a basis to effect a recovery of International’s total cost of goods sold plus allocable administrative and selling expenses attributable to sales to Pan-American as determined by the accountants of International. *688 The administrative and selling expenses of International attributable to its sales to Pan-American were determined in the following maimer.
These expenses were incurred by International in Indianapolis, representing personnel and other administrative costs relating to the operations of both International and Pan-American. These personnel were on the payroll of International. This procedure was adopted for practical economic reasons primarily because of the difficulty which would attend the placing of the same administrative and staff personnel on two different payrolls. These personnel performed functions on behalf of both International and Pan-American, and consequently Pan-American was charged with part of the expense of these services. During the years 1952 through 1957 the allocation of expenses was based on a three-factor formula of:
(1) total sales of each of the two companies, International and Pan-American;
(2) the total number of distributors of each of the two companies; and
(8) the total number of sales representatives of each of the two companies. These three factors were averaged, which composite average was used to allocate part of International’s expenses to Pan-American.
10. After January 1,1944, and during all the years in issue, Eli Lilly confined its marketing operations to the United States. During these years, Eli Lilly marketed nearly 1,000 different ethical drugs[1] and related products through wholesale distributors throughout the United States. The price of its products to its domestic wholesalers was, generally, domestic net trade price less wholesale discounts of 15 percent and 7 percent. “Net trade price” is the suggested price given to the wholesaler for pricing to the retailer as noted in the domestic price list.
The marketing of Eli Lilly’s products in the United States requires the dissemination of technical information to the doctors of this country together with extensive instruction on the uses and propensities of its products. During the *689 years in issue, Eli Lilly did no marketing or advertising to the general public, but confined its advertising efforts to the doctors and technicians who recommended or employed its products. Although Eli Lilly distributes domestically only through wholesale distributors throughout the country, it performs all advertising and instruction through its own employees at its own expense and assumes the legal responsibility for all of its products. As a consequence, its distributors perform mainly the function of supplying the various products primarily to pharmacies and hospitals.
11. Prior to 1923, Eli Lilly’s sales activities outside the United States were of a minor nature. However, in 1923 it established an export marketing division under the direction of an employee who traveled extensively for the purpose of employing salesmen and appointing distributors in various countries of the world. In the year 1934 Eli Lilly organized a wholly owned subsidiary in England, Eli Lilly and Company, Limited, to develop business in the British Isles. That company operated exclusively as a sales company for Lilly products purchased from Eli Lilly. After the organization of Eli Lilly and Company, Limited, a transfer price on all merchandise sold to it by Eli Lilly was established at Eli Lilly’s factory cost which included all raw material cost, direct labor cost, and all factory overhead. This price arrangement was established to give incentive to the personnel of Eli Lilly and Company, Limited, to expand and develop markets in the British Isles.[2]
In the year 1938 Eli Lilly established a wholly owned subsidiary, Eli Lilly and Company (Canada), Limited, in the Dominion of Canada which had as its objective the sale of Eli Lilly products in Canada. After the organization of Eli Lilly and Company (Canada), Limited, a transfer price on all merchandise sold to it by Eli Lilly was established at Eli Lilly’s factory cost on the same basis that was used for making sales to Eli Lilly and Company, Limited.
*690 12. During the year 1940, J. K. Lilly, Jr. assumed the responsibility for the export sales division of Eli Lilly, which responsibility was in addition to his existing responsibilities as head of the domestic marketing of Lilly products. Immediately upon acquiring the responsibility for export marketing, Mr. Lilly initiated a study to determine the proper method of organization for international trade. This study was primarily economic in nature, and concerned itself with potential markets in various countries of the world and with the conditions under which business would have to be conducted in those countries, including the problem of language barriers which differ hemispherically. This study was headed by Mr. Lilly and was conducted through staff personnel, including legal counsel. It involved economic research, market research, and financial research. The study resulted in the conclusion that the export business of Eli Lilly was naturally divided into two hemispheres, the Eastern Hemisphere and the Western Hemisphere. It was further concluded that Eli Lilly would be required to have separate groups of personnel specialized in the different aspects of each of the hemispheres in order to develop effectively its export market.
13. The study culminated in the organization in 1941 of two export marketing divisions, the Eastern Hemisphere Division and the Western Hemisphere Division. Mr. A. L. Young, who had been active in promoting sales for Eli Lilly in the Far East since 1928, was appointed director of the Eastern Hemisphere Division, and Mr. Forrest Teel, who had been with Eli Lilly since 1929 primarily operating in Latin America, was appointed director of the Western Hemisphere Division. On December 31, 1942, a letter was sent to all export customers advising them of the management appointments of Mr. Young and Mr. Teel and describing Eli Lilly’s change in export marketing organization. These division directors traveled extensively and appointed distributors in the various countries within their respective hemispheres. However, all staff work required by the Eastern Hemisphere Division and the Western Hemisphere Division was performed by Eli Lilly domestic personnel not assigned *691 to the export division. This lack of identification was unsatisfactory because these employees tended to treat the export divisions, in the words of one official, as stepchildren. The export divisions received attention from staff personnel in such matters as billing, shipping, traffic, sales records, and statistics only after domestic business, reports, and service had been completed.
14. After the formation of the divisions, Mr. Lilly continued his search for a more effective way to organize for export since he was convinced that Eli Lilly was not doing as effective a job abroad as could be done. He felt that Eli Lilly was not keeping abreast of its competition in the export field, so the matter was kept under continuous study.[3]
In June of 1943, Eli Lilly management decided that the best way to operate in export trade was through subsidiary corporations. This decision was implemented by the organization of two wholly-owned subsidiaries, International to service business in the Eastern Hemisphere, and Pan-American to service most of the business in the Western Hemisphere. International and Pan-American commenced operations on October 1, 1943. The following minutes of the meeting of Eli Lilly’s board of directors on September 20, 1943, reflect the decisions of management in this regard:
Mr. Eli Lilly then called upon Mr. J. K. Lilly, Jr., who submitted the following report.
The Export business of the Company has enjoyed a remarkable growth during the past few years and after careful consideration and investigation it has been concluded that from the standpoint of efficient and progressive administration and operations, the export business of the Company should be handled by subsidiary distributing corporations. Separate subsidiary corporations should be organized for the existing Export Divisions.
It is therefore recommended that a corporation to be known as Eli Lilly Pan-American Corporation be organized to handle all exports in the Western Hemisphere except shipments to the Canadian subsidiary and it is also recommended that a new subsidiary corporation to *692 be known as Eli Lilly International Corporation be organized to handle all sales in the Eastern Export Division.
It is further recommended that the capital of each of these new subsidiary corporations should consist of 10,000 shares of no par value common stock and that the sum of $200,000 be fixed as the amount of paid in capital for Eli Lilly Pan-American Corporation and the sum of $100,000 be fixed as the amount of paid in capital for Eli Lilly International Corporation.
Mr. J. K. Lilly, Jr. thereupon introduced and moved the adoption of the following resolution which was seconded by Mr. N. Ii. Noyes and after discussion was unanimously adopted.
Resolved by the Board of Directors of Eli Lilly and Company that the Treasurer of the corporation be and hereby is authorized for and in the name of the corporation to subscribe to $200,000 of the no par value common stock of a new subsidiary corporation to be organized in the name of Eli Lilly Pan-American Corporation.
Further Resolved by the Board of Directors of Eli Lilly and Company that the Treasurer of the corporation be and hereby is authorized for and in the name of the corporation to subscribe to $100,000 of the no par value common stock of a new subsidiary corporation to be organized in the name of Eli Lilly International Corporation.
15. One of the purposes in organizing International and Pan-American was to provide supervision for other companies that were to be organized later by Eli Lilly to engage in export trade in specific major markets of the world. As a result of the same study Eli Lilly, in the year 1943, organized under the laws of Mexico a wholly-owned Mexican subsidiary, Eli Lilly and Company de Mexico S.A. de C.V. (Lilly of Mexico). Except for sales to the Mexican Government, Lilly of Mexico became the sole distributor of Lilly products in Mexico. For the most part it purchased those products from Pan-American and sold them to Mexican wholesale distributors. Commencing in 1956 or 1957, however, it did some manufacturing and packaging itself in newly constructed facilities.
Also, shortly after the organization of Lilly of Mexico, Eli Lilly organized, in the year 1944, Eli Lilly and Company *693 of Argentina, Inc., and Eli Lilly and Company of Brazil, Inc., both Indiana corporations. Their operations within Argentina and Brazil, respectively, were essentially the same as the operations within Mexico by Lilly of Mexico, as described above.
Each of Eli Lilly’s above-described subsidiaries operating in the Western Hemisphere had its own officers, administrative staffs, marketing staffs, production staffs, and salesmen. Pan-American maintained no salesmen in those countries in the Western Hemisphere where Eli Lilly’s other subsidiaries were operating.
16. In the fall of 1943, additional studies were made by Eli Lilly to determine the proper transfer price of Lilly products from Eli Lilly to its two newly formed corporations, International and Pan-American. At that time various hazards of the export market, such as exchange fluctuations, price controls, import restrictions, expropriations of property, the risk of patent exposure, and credit risks were specifically considered in their relation to the transfer price from Eli Lilly to Pan-American and International. The object of these studies was to try to arrive at a price that satisfied the business purpose of these companies and specifically to assist them in the expansion and development of business outside of the United States.
In January 1944, J. K. Lilly, Jr., called a meeting of several Eli Lilly executives and outside consultants to determine a proper pricing policy. The proposals at this meeting ranged from discounts off domestic net trade prices (suggested prices to retailer) of 65 percent to discounts off domestic net trade prices of 55 percent. Mr. Teel and Mr. Young, who were in charge of the export corporations, favored a higher discount rate off domestic net trade prices. After lengthy discussion, Mr. Lilly called upon everyone in the room to vote and then computed an average of the positions taken by the various participants, which average resulted in a discount of approximately 60 percent off domestic net trade as the appropriate price at which merchandise should be sold to International and to Pan-American by Eli Lilly. This was altered slightly the next day by Mr. Lilly *694 who had meanwhile decided that a further incentive pricing arrangement should be adopted to provide additional motivation for the export companies. This alteration took the form of a bracket system which was incorporated into agreements with International and Pan-American as of January 1, 1944.
17. The agreement between Eli Lilly and International which first governed the transfer of merchandise to International read, in pertinent part, as follows:
1. International agrees:
a. To devote its entire energies through its representatives in the Eastern Hemisphere to the promotion of the sale of products manufactured by Lilly during the time that this contract shall remain in force and effect.
b. To bear all selling and transportation costs, and in addition to expend such amounts as may be necessary to promote the sale of Lilly products throughout the Eastern Hemisphere.
c. To purchase Lilly products at Indianapolis, and thereafter to assume all administrative expense necessary to the conduct of its business in a proper manner in the Eastern Hemisphere and to employ such competent personnel as may be necessary for the proper expansion and growth of its business in the Eastern Hemisphere.
2. Lilly agrees:
a. To sell to International during the year 1944 at a discount of 58% from the net trade prices shown in Lilly’s domestic trade catalogue.
b. To sell to International during the year 1945 and future years upon the basis of the following scale of discounts from the net trade prices shown in Lilly’s domestic trade catalogue.
On the first $880,000 of purchases during the calendar year the discount shall be 55%
On the next $38,000 of purchases during the calendar year the discount shall be 57%
On the next $38,000 of purchases during the calendar year the discount shall be 59%
On the next $38,000 of purchases during the calendar year the discount shall be 61%
On the next $38,000 of purchases during the calendar year the discount shall be 63%
On all purchases exceeding $532,000 during the calendar year the discount shall be 65%.
It is agreed that Lilly shall bill International at a flat discount throughout each year, based upon the *695 volume for the previous year. For example, tbe discount effective for the year 1945 shall be a flat discount based upon the volume purchased by International from LiUy during the year 1944.
The agreement between Eli Lilly and Pan-American which first governed the transfer of merchandise to Pan-American was substantially the same as the above agreement with International, except that the Pan-American agreement, of course, related to the Western Hemisphere, and the bracket system for discounts differed insofar as purchase volumes were concerned.
The aforesaid agreements were duly ratified and approved by the board of directors of Eli Lilly. The agreements represented at that time the composite judgment of management.
18. One of the factors which was considered in the January 1944 meeting of management in arriving at the intercompany price was credit risks and related costs. It was anticipated that terms of sale would range between 90 and 180 days of the date of invoice and, even with responsible wholesalers abroad, exchange restrictions, dollar quotas, and other factors would not allow prompt payment of collection invoices in many instances. In addition, Eli Lilly did not have first choice of foreign wholesale distributors since it was substantially behind competition in exploring new markets. Also, better sources of credit information and reference materials were available in the domestic market than in the export market. It was also recognized that the financial responsibility of the foreign wholesale distributors would generally not be comparable to that of the domestic wholesale distributors of Eli Lilly.
The cost of shipping was an additional factor which was considered at the January 1944 meeting. Not only was shipping more expensive because of the distances involved, but the conditions under which merchandise had to be shipped in export trade caused the products, in many cases, to be exposed to heat and humidity which affected the stability of the products and made it more difficult to deliver merchandise in salable form.
In addition, all biological products sold by Eli Lilly are dated, which means that after a certain date the product *696 should not be used. Smallpox vaccine, for example, has a six-month dating period. A few biological products have dating periods longer than two years. Certain other non-biological products also bear an expiration date. These dates are applied to the product as it is prepared in Indianapolis. Therefore, if shipping time were 30 days, a percentage of the sales life of the product has been lost because the usable life has partially expired on the dated product by the time it reaches its destination. When time expires on such dated products, the merchandise is destroyed and the customer either receives replacement merchandise or is furnished a credit memorandum. Insofar as dated merchandise is concerned, losses are heavier in export than in domestic sales because of the time involved in shipping and the hazards of shipment. However, Eli Lilly’s overall losses on all returned and destroyed merchandise are heavier percentage-wise in domestic sales than in export sales.
19. Many other factors bearing upon the problem of inter-company prices were considered and discussed at the January 1944 meeting. The promotion of the Lilly name, which was not then well-known abroad, the development of advertising material in foreign languages, the preparation of price lists, product registrations, and the training of salesmen abroad combined to make the cost of developing international markets substantially greater than the cost of developing new domestic markets. There also had to be borne in mind the possibility of confiscation or expropriation by foreign governments.[4] Price controls, which were common in foreign countries, affected the profits of distributors and their ability to pay for merchandise promptly. This factor had to be taken into account, therefore, in the formulation of a pricing policy. It was also necessary to consider the effect on prices of other governmental activity abroad such as licensing and import restrictions on drugs and national health plans. In addition, some foreign countries do not have *697 patent laws protecting pharmaceutical products, and the risk of patent exposure in such countries had to be considered. Finally, a factor for consideration was Eli Lilly’s position as a broadline pharmaceutical house. It manufactures and sells between 900 and 1,000 different products. Such variety creates problems in maintaining inventories, running production orders, handling raw materials, and in administration generally. As a consequence, Eli Lilly tends to be a higher cost producer than those companies which do not have such a broad line of products.
20. In the January 1944 discussions, no consideration appears to have been given to taxes. However, in the following month the subject was considered, and on February 11, 1944, Pan-American requested a ruling from the Internal Revenue Service as to its status under the Western Hemisphere trade corporation provisions of the Internal Revenue Code of 1939. Pursuant to that request, the Commissioner of Internal Revenue issued a favorable ruling to Pan-American under date of March 28, 1944, which concluded as follows:
Based upon the foregoing statements presented in your communication, it is held that you meet the provisions of section 109 of the Internal Revenue Code and that you are exempt from surtax under the provisions of section 15(b) and also exempt from excess profits tax under the provisions of section 727 (g) of the Code. This ruling is predicated solely upon the statements presented and therefore a final determination relative to your qualifications under the provisions of the Code referred to above may be made only after the actual facts have been ascertained and verified at the time of the examination of your Federal tax returns filed for the year under consideration.
21. In 1946 International became the sole purchasing organ for export of Eli Lilly products. It, in turn, during and after 1946, resold merchandise to Pan-American. The change in merchandise flow was recorded in the following contract dated January 1, 1946 between Eli Lilly and International:
WheReas Lilly is engaged in the manufacture and sale of medicinal products and is desirous of obtaining the largest possible sale thereof throughout the world; and
*698 WheReas International maintains a staff of technical, administrative, management and clerical employees with qualifications and training in handling export sales; and
Whereas Lilly desires that the sale of products manufactured by it be distributed in export by or through a single selling agency or distributor;
Now Therefore the parties do hereby stipulate as follows:
1. Lilly hereby appoints International as its exclusive distributor for the exportation of Lilly Products throughout the world.
2. International agrees:
(a) To devote its entire energies through its representatives to the promotion and sale of Lilly Products in or for export markets throughout the world during the time that this contract shall remain in full force and effect.
(b) To bear all selling and transportation costs, and in addition to expend such amounts as may be necessary to promote the sale of Lilly products throughout the principal export markets of the world.
(c) To purchase Lilly Products at Indianapolis, and thereafter to assume all administrative expenses necessary to the conduct of its business in a proper manner and to employ such competent personnel as may be necessary for the proper expansion and growth of its business.
(d) To distribute Lilly Products in the principal export markets of the world utilizing for such distribution such importers, wholesale dealers, and other firms and corporations which, in the judgment of International, afford the best possible facilities for such distribution.
3. Lilly agrees to sell and supply Lilly Products to International on and after January 1, 1946, such products to be finished, labeled and packed in shipping cases according to specifications supplied by International and to make delivery thereof at its shipping platform in Indianapolis, upon the following basis:
(a) Upon finished and packaged merchandise, at a discount of 60% from the net trade prices shown in Lilly’s domestic trade catalogue.
£>) In respect of semi-finished or bulk merchandise, illy’s cost plus 15%.
4.Lilly agrees to supply International with samples, promotion and advertising material pertaining to products of its manufacture at a price not in excess of the production cost and delivery charge.
5.Lilly agrees to accept outdated and unsalable merchandise at the prices prevailing at the time the return is *699 made, said merchandise to be returned to Indianapolis at the expense of International except where shipping conditions or other restrictions render it necessary or advisable to destroy such merchandise.
6. Lilly hereby grants to International a revocable license to use and employ trademarks and copyrights owned by Lilly and adaptable for use by International in the sale and promotion of Lilly Products in export markets, hereby granting unto International, specifically, but without limitation, the right and license to use the SCRIPT lilly trademark and the right to use trademarks owned by Lilly and identifying specific products. International shall have the right to grant sub-licenses, corresponding in scope with the license granted under this paragraph.
_ 7. Either party hereto may cancel this contract upon ninety (90) days written notice to the other party.
At a meeting of the directors of Eli Lilly on January 7, 1946, the foregoing contract was approved and adopted, and all pre-existing contracts with export subsidiaries were canceled.
22. Eli Lilly continued to operate essentially under the January 1, 1946 contract quoted in the preceding finding through all the years in issue. Although the bracket incentive system had been abandoned, there was no basic change in pricing policy reflected in the new contract as compared with the 1944 agreements. Under this new contract all merchandise destined for export was purchased from Eli Lilly by International and sold by the latter either to Pan-American, to other subsidiaries of Eli Lilly, or directly to unrelated wholesalers in the Eastern Hemisphere. The pricing policy disclosed in this contract continued through Eli Lilly’s taxable year 1948.
In an audit of Eli Lilly’s tax returns during 1948, the Internal Revenue Service proposed an adjustment to inter-company transfer prices for the taxable years 1944, 1945, 1946,1947, and 1948 by reallocating income of International and Pan-American to Eli Lilly for those years under section 45 of the 1939 Code (now section 482 of the 1954 Code). The dispute was compromised. Thereafter, for its taxable years 1949, 1950, and 1951 Eli Lilly transferred merchandise to International and prepared its tax returns for those years on the basis of the settlement with the Internal Revenue Service for the years 1944 through 1948.
*700 23. During 1947 and 1948, according to Eli Lilly’s president, the company’s antibiotic production facilities were completely inadequate. Between 1947 and 1952, Eli Lilly invested many millions of dollars to expand its antibiotic production facilities. Moreover, during that time, methods of producing penicillin had improved. Also, because of production difficulties experienced with streptomycin in 1952, Eli Lilly had to purchase that drug from other producers at a cost in excess of its ultimate selling price. Eli Lilly was willing to absorb the resulting loss because it wanted to be in a position to supply streptomycin both domestically and in the foreign market. In keeping with its reputation as a broadline house, Eli Lilly desired to supply all the major antibiotics in use, and it was confident that in the near future it would develop the ability adequately to supply streptomycin to its customers from its own manufacture.
24. In the year 1952 Eli Lilly re-examined its position on pricing to International. It had become apparent that Pan-American and International were finding it difficult to make profits. Prices were demoralized in the antibiotic field and, as stated above, streptomycin was being purchased by Eli Lilly because of its difficulties in manufacturing that product. Also, there was a continuing tax problem under section 45 of the 1939 Internal Revenue Code, and the company’s accountants and tax attorneys told management that the existing pricing arrangement flowing from the settlement described in finding 22 above had placed Eli Lilly at a substantial disadvantage taxwise with respect to the rest of the industry. Accordingly, studies were made during the year 1952 and advice was obtained to determine what action should be taken with respect to the transfer price from Eli Lilly to International. This study was participated in by the highest management officials of Eli Lilly. They found that if Eli Lilly continued to price on the basis of the composite average which it had used (as a result of the aforesaid settlement) during the years 1949, 1950, and 1951, International and Pan-American would have operated at losses during the year 1952.
The pricing policy finally established for the year 1952 differed from the policy which had been used in the years *701 1944 through. 1948. The price arrangement which had been in effect from 1944 through 1948 had been considered in terms of a discount off domestic net trade prices which was the common denominator at that time in maintaining inventory controls. The price which was determined in 1952 was a cost-oriented price which made no provision for a specific monetary profit to Ely Lilly. All sales by Eli Lilly to International under the 1952 policy were priced, as previously stated, to effect a recovery of the manufacturing cost of goods sold plus royalties payable by Eli Lilly to third parties plus all operating expenses incurred by Eli Lilly incident to the servicing of the export business.
This management decision took into consideration all of the factors which were considered originally in 1944 in determining the appropriate prices to International and to Pan-American but with the benefit of the experience which had been obtained thereafter in conducting export operations. It also took into consideration the continuing tax problem under section 45 referred to above.
25. The pricing decision in 1952 was the composite judgment of management at that time. Under this policy all merchandise was transferred to International at the same price regardless of whether the final destination of the merchandise was to be in the Eastern Hemisphere or in the Western Hemisphere.
26. The following minutes of the Executive Committee of Eli Lilly formally record the actions taken on various dates in adopting the pricing policy for the year 1952:
Excerpts from Minutes of Meetings of the Executive Committee of Eli Lilly and Company
Mr. Hadley presented the problems that have arisen with respect to selling prices to Eli Lilly International Corporation. He pointed out that there is a continuing tax problem under Section 45 of the Internal Revenue Code. The question was settled by compromise with the Indianapolis office of the Internal Revenue Bureau in 1950 in a manner not entirely satisfactory to the Company. We have been advised by Ernst and Ernst and, also, the law firm of Lee, Toomey and Kent that our present pricing arrangement places us at a substantia] *702 disadvantage tax-wise with respect to the rest of the industry. Our prices to International in 1950 were approximately manufacturing cost plus Vs: in 1952, at manufacturing cost plus Many companies sell to Western Hemisphere subsidiaries at cost plus allocable parent company expense, which would be approximately cost plus 12% "for Eli Lilly and Company. After discussion of the tax implications, the Committee approved that recommendation be made, to be presented to the Board of Directors at its September meeting, that an appropriate officer of the Company be authorized to set selling prices to International at a level which in his judgment would be in the best interests of the Company. $ $ ‡ $
The Committee approved the establishment of selling-prices for the Company’s products to Eli Lilly International Corporation at a discount of 55% from net trade prices, effective for the year 1952 and until further order of the Committee.
* ^ * * *
The Committee approved the following prices to Eli Lilly International Corporation to cover sales for the year 1952.
a. All finished trade packages excepting streptomycin at net trade less 53%.
b. Streptomycin at cost.
c. Bulk merchandise at cost plus 15%
For the year 1953 until further notice prices on all finished trade packages to International shall be net trade less 52%, with bulk merchandise at cost plus 15%. This price schedule is subject to quarterly review.
27. During the years in issue, International entered into written contracts for distribution of Eli Lilly products with all its wholesale distributors throughout the Eastern Hemisphere. The form of the distributor’s contract used by International during the years in issue was as follows:
GENTLEMEN :
We propose that you agree:
FIRST, to maintain a stock of Lilly pharmaceutical and biological products at all times sufficient to supply satisfactorily the demand for these products from your trade without unnecessary resort to third-party shipments.
second, to supply Lilly products on all unspecified orders and to give Lilly products the full selling effort *703 of your sales organization in preference to any other brand or label in every proper and lawful manner.
THIRD, to supply Lilly products to the retail drug trade at a maximum markup of 25 percent over laid-down cost unless otherwise provided by law.
fourth, that laid-down cost is the price of the merchandise plus cost of transportation and insurance from the U.S. border, import duty, and consular fees at_
fifth, to protect the retail drug trade and encourage its support of the Lilly line by establishing and maintaining retail prices that permit the drug trade to compete with your retail establishments on a minimum markup of 20 percent of the net cost to the retailer, unless otherwise provided by law.
In consideration of the foregoing agreement on your part we agree:
1st. To invoice all products at best net export prices in United States dollars plus costs of consular fees and transportation and insurance from the United States border on freight shipments weighing over one hundred pounds and from Indianapolis on all other shipments.
2d. To maintain an adequate sales force whose activities are to be dedicated exclusively to the promotion and sale of Lilly products through our recognized wholesale distributors.
3d. To receive for credit, on the basis of current cata-logue value plus cost of transportation, unsalable merchandise of our manufacture in original unopened packages, provided you first submit to us an itemized list of the unsalable merchandise you desire to return and give us ninety days in which to dispose of it, either by sale to your customers by special efforts on our part or such other disposition as we may want to make. If at the end of ninety days we have not made other disposition, you are at liberty without further notice to return the unsalable merchandise to us at Indianapolis, Indiana, U.S.A.j you to deliver the goods free of expense to us. Biologicals and dated merchandise in unopened packages may be returned on the same terms any time after date of expiration. Parts of bulk shipment cannot be considered original unopened packages.
4th. To invoice all shipments on the basis of net cash -days. A cash discount of-percent may be deducted if payment is made in U.S. dollars within thirty days’ date of invoice. All invoices are to be covered by drafts drawn in United States dollars unless *704 other mutually satisfactory arrangements are made. The cash discount cannot be allowed on delayed remittances, regardless of the cause.
It is further understood and mutually agreed that:
A. Nothing herein shall prevent you from stocking the products of a Lilly competitor in such an assortment and in such quantities as may be necessary to meet the specified demand such a competitor may create through his own effort for his products.
B. Title to the merchandise shall remain in Eli Lilly International Corporation until delivery to you or your agent in.Upon such delivery title shall pass to you and any subsequent loss or damage shall be for your account.
C. This agreement may be canceled at any time by either party on sixty-day notice in writing given to the other.
28. During the years in issue, International had an average of 50 wholesale distributors located throughout the Eastern Hemisphere in over 85 foreign countries. The average number of wholesale distributors sold to by Eli Lilly’s other subsidiaries which operated outside the United States ranged from 327 in 1952 to 392 in 1957.
29. During the years in issue, International made the following sales:

Analysis of Net Sales of Eli Lilly International Corporation

us$ (000’s Omitted)

30.During the years in issue, International had the following employees:

*705 The responsibilities of the administrative personnel located in the United States were as follows:
(a) to establish general policies for the manufacture, sale, and distribution of Eli Lilly products sold outside the United States, including general policies with respect to personnel, sales, finance, sales promotion, facilities, accounting, and production;
(b) to survey potential foreign markets and determine new markets in which Eli Lilly products should be sold;
(c) to assist in the procurement, construction, and maintenance of all land, buildings, equipment, and other facilities of affiliates outside the United States;
(d) to survey and evaluate plants of unrelated licensees outside the United States;
(e) to render technical assistance needed in manufacturing and processing of Eli Lilly products outside of the United States by affiliates and licensees, and to obtain Eli Lilly approval on merchandise produced abroad containing Eli Lilly labels;
(f) to negotiate, as a principal party, contracts with various distributors outside the United States for the sale of Eli Lilly products;
(g) to accept and translate all orders received from affiliates or distributors throughout the world for merchandise to be supplied by Eli Lilly;
(h) to process and control all orders for Eli Lilly merchandise which were prepared for shipment to affiliates and distributors outside of the United States;
(i) to prepare and render invoices to affiliates and distributors for all Eli Lilly merchandise shipped outside of the United States;
(j) to prepare and render monthly statements to affiliates and distributors for all Eli Lilly merchandise shipped outside the United States;
(k) to approve credit of customers outside the United States purchasing Eli Lilly merchandise and determine credit risk;
(l) to make all collections for Eli Lilly merchandise sold to affiliate and/or distributors;
*706 (m) to establish and maintain satisfactory relationships with the pharmaceutical and medical professions outside the United States;
(n) to make all arrangements with common carriers, including rail, truck, air, and steamship and for marine insurance for shipment of all Eli Lilly merchandise to affiliates and distributors outside the United States;
(o) to approve the employment and assist in the training of competent salesmen for all countries outside the United States;
(p) to supply salesmen with samples, literature and other merchandising aids for all areas outside the United States where this function was not performed directly by an affiliate;
(q) to schedule activities of all salesmen employed outside the United States except those of the United Kingdom subsidiary of Eli Lilly;
(r) to prepare promotion schedules and to render technical assistance to affiliates in the preparation of promotional schedules for all countries outside the United States;
(s) to establish personnel policies relating to salaries, bonuses, vacations, and retirements for all of its employees and those of affiliates outside of the United States;
(t) to initiate registration of Eli Lilly products in all countries outside the United States including countries where affiliates were located where such registration was required by the Departments of Health in the respective countries;
(u) to establish pricing policies for all Eli Lilly products sold outside the United States;
(v) to create technical promotional material and to translate this material from English to foreign languages and from foreign languages to English;
(w) to maintain necessary financial records for all affiliates incorporated in Indiana but engaged in foreign trade;
(x) to prepare and analyze financial reports and to publish all financial statements translated into United States currency for all affiliates engaged in foreign trade;
(y) to establish and maintain internal audit procedures and to employ independent chartered and certified public accountants both in the United States and abroad to examine *707 the financial statements of affiliates engaged in foreign trade;
(z) to select and retain legal counsel both in the United States and abroad to advise and assist on legal matters involving the manufacture, sale, distribution, and registration of Eli Lilly products in foreign countries;
(aa) to initiate action to obtain trademark and patent registration of all Eli Lilly products in countries outside the United States including countries where affiliates were located where such trademark and patent registration is required.
31. The responsibilities of International personnel located outside the United States in the Eastern Hemisphere during the years 1952 through 1957 were as follows:
(a) to educate and train a highly specialized group of salesmen as to the special qualities of Eli Lilly products and to train these sales people in the most effective use of these products so as to enable them to promote effectively the sale of Eli Lilly products;
(b) to educate salesmen of authorized distributors in the sales and promotion of Eli Lilly products;
(c) to supervise clinical trial programs of Eli Lilly products under clinical investigation for future marketing;
(d) to maintain liaison with medical and pharmaceutical schools and to contact all medical students to explain and instruct them on the use of Eli Lilly products;
(e) to contact commercial and industrial organizations which operate medical service field installations for their employees;
(f) to establish and maintain satisfactory business relationships with physicians, druggists, hospitals, distributors, and the medical and pharmaceutical professions in the areas of assignment;
(g) to speak the language or languages used in the areas of assignment;
(h) to educate the physicians and druggists on the latest pharmaceutical developments, especially those of Eli Lilly;
(i) to promote the use of Eli Lilly products in the areas of assignment;
(j) to solicit orders from druggists, doctors, and hospitals for authorized distributors of Eli Lilly products;
*708 (k) to assist in maintaining inventory levels of tbe distributors in keeping with the demand in the area for Eli Lilly products;
(l) to assist in obtaining registration approval from the Departments of Health for sale of each new product to be sold in each country where required.
(m) to assist in obtaining the registration of trademarks for the name of each new product in each country where such protection was desired, or necessary;
(n) to serve as responsible pharmacists in those countries where such responsibility is required by law, and to insure the proper labeling of each product sold in each country within the area of assignment and especially in those countries which require the name of a responsible pharmacist and his pharmacy license number to appear on all labels;
(o) to assist in obtaining import licenses and dollar exchange for distributors for importation of Eli Lilly merchandise ;
(p) to assist authorized distributors in clearing Eli Lilly merchandise through local customs;
(q) to receive and deliver personally, when required, direct importations of Eli Lilly products;
(r) to assist in the collection of direct accounts on direct importations which had become delinquent;
(s) to supervise licensed third-party production in those countries where this type of production is employed;
(t) to present sealed bids for the sale of Eli Lilly products and represent International in opening those bids for the purchase by pharmaceutical agents of foreign government entities, and if required, to post performance bonds with respect to such bids;
(u) to supervise the receipt and distribution of promotional materials and train all salesmen in the most effective use of these materials for the promotion of Eli Lilly products;
(v) to organize, prepare, and attend exhibits of Eli Lilly products at medical conventions;
(w) to place journal advertising in selected medical publications ;
(x) to supervise publication and distribution of local price lists in the respective countries;
*709 (y) to obtain favorable consideration of or endeavor to obtain equitable prices for Eli Lilly products in those countries where price control is legally administered;
(z) to inform the Indianapolis office of any medical problem that may have been encountered with respect to an Eli Lilly product;
(aa) to negotiate with local counsel for indemnification payments to separated employees when required;
(bb) to obtain the necessary documents for both entering and leaving the country within an assigned area where responsibilities extended into more than one governmental unit.
32.During the years in issue, the total number of employees under the direction and control of International was as follows:

33. During the years in issue, Pan-American entered into written contracts for distribution of Eli Lilly products with all its wholesale distributors throughout the Western Hemisphere. The average number of those distributors was 63, and they were located or operated in over 28 different countries mostly in the Caribbean, Central, and South America. Except for changes of names and the specification of a two percent discount for payments within 30 days, the form of the contract between Pan-American and its distributors was substantially identical to the form of distributor’s contract used by International as quoted in finding 27, supra. 34. During the years in issue Pan-American made the following sales in dollars (000’s omitted):

*710 35. During the years in issue, Pan-American had the following employees (not including officers) located outside the United States:

Year Marketing Year Marketing

1952_ 122 1955_ 140
1953_ 129 1956- 145
1954_ 134 1957_ 93
The responsibilities of those employees were identical to the responsibilities of International personnel located outside the United States as set forth in finding 31, swpra.
36. The approaches used by International and Pan-American in expanding markets outside the United States were the same during the period 1952 to 1957. The principal objective of each company was to acquaint the medical profession and the pharmacists with the Eli Lilly name and the products which it sells and the quality of those products. This objective was accomplished by engaging representatives who would become qualified to acquaint the medical profession with Eli Lilly and its products. In addition, these representatives were provided with promotional materials, such as samples and literature, to assist them in their work with the medical profession and the pharmacists abroad.
37. In their endeavor to sell merchandise outside the United States, International and Pan-American did not rely on bargain sales of merchandise abroad. It was the opinion of management that price cutting of Eli Lilly merchandise abroad would eventually lead to deterioration of the Eli Lilly image which the export companies had endeavored to create abroad. 'In addition, it was felt that such methods would probably dilute the emphasis which Eli Lilly was endeavoring to place on the quality of its merchandise.
The Lilly export price list was known as the “Interex.” Its prices were approximately the same as those in the domestic price list. The price at which International and Pan-American sold to their wholesale distributors (whether brokers located within or distributors without the United States) generally was the Interex net trade price less 15 percent. *711 “Net trade price” used in connection with the Interes, as in the domestic price list, is the suggested price to the retailer. There was added to the price of all sales to wholesale distributors in the Eastern and Western Hemisphere consular fees, transportation, and insurance from the United States border. The insurance policies were carried by International and Pan-American, and in case of loss the insurance company paid International or Pan-American the value shown on the invoice.
38. Under Eli Lilly’s approach the cost of penetrating foreign markets was dependent upon whether or not the particular market involved had previously experienced sales of Lilly products. In selling those products in markets which had not previously been sold, such as in the Scandinavian area, the export subsidiaries encountered high expenses in their endeavors to penetrate these markets. In the case of Denmark, for example, the marketing expenses (which would include salesmen’s salaries, traveling expenses and promotional materials) were in excess of 90 percent of the sales that were realized in Denmark in 1956. In 1957 these expenses in Denmark were approximately 50 percent of sales. In the Western Hemisphere Pan-American also experienced high expenses in its endeavor to penetrate certain markets. Panama and Uruguay were two examples of markets which required an extremely high marketing cost in order to generate sales. In these markets the marketing cost during the years in issue ranged from 35 to 50 percent of the sales that were made.
39. During the years in issue, Eli Lilly, International, and Pan-American all experienced substantial competition from numerous large United States and foreign pharmaceutical and chemical companies, such as American Cyanamid Company, Merck & Co., Inc., Olin Mathieson Chemical Corp., Parke, Davis & Company, Imperial Chemical Industries, Ltd., and Farbenfabriken Bayer. In addition to those competitors, Pan-American and International experienced substantial competition from national companies that operated in many of the countries in which these two export companies sold merchandise.
*712 40. The pharmaceutical business tends to be volatile and seasonal. Eli Lilly, however, has endeavored to maintain a uniform work force, that is, it does not lay off employees or hire extra employees to meet slack periods or increased temporary demands. To this end, its production planners were given considerable flexibility in inventory and other planning.
In its production planning Eli Lilly used historical data to project trend lines. In this planning it weighed four factors: inventories, customer service, uniform work load, and production economics. The manner in which Eli Lilly made its production predictions was the same whether gathering historical data for the domestic market (including industrial) or the international market. The production planners, in addition to using historical data, consulted with the individuals responsible for marketing in the various marketing areas and considered promotional programs and competitive activity which might influence projections made on historical data.[5] After setting production trend lines, the production planners watched actual sales to see if their estimates were correct. If an item were underproduced, a rush manufacturing order or packaging order was issued to put the goods needed in inventory as quickly as possible.
41. During the years in issue, priorities in Eli Lilly production, when necessary because of low inventories, were as follows:
(a) Red Cross disaster need
(b) United States Government contracts
(c) Clinical Trial Materials
(d) New Product Additions with Priority
(e) New Product Additions
(f) Promotional Materials
(g) Non-Carried Items[6]
*713 (h) Normal Inventory Replenishments of Carried Items
The policy of Eli Lilly during the years in issue and at all times prior thereto has been to protect the health of United States citizens first. If a product was in short supply, the needs of the United States and its possessions were always met first. If a new product became available, the United States market was satisfied before the export market. An example of this policy was the original distribution of Salk polio vaccine which was available in the domestic market generally for a period of about 9 months prior to the time it was shipped abroad. Polio vaccine was sold through the National Foundation for Infantile Paralysis on April 1, 1955, and was not made available generally for export to foreign countries until January of 1956. Another example occurred when a new form of antibiotic marketed during the years in issue was not made available for export until 11 months after it was sold domestically.
42. Subject to the priorities mentioned, the same products were sold by Eli Lilly for export that were sold in the United States market. During the years in issue, no product was researched or developed specifically for foreign markets. Such international product research was not done by Eli Lilly until 1964.
Production planning was also handled in the same manner whether items were destined for the domestic or for the foreign market. The domestic market was easier to predict than the foreign market because the latter was an expanding market and because there were constant changes in various country requirements and regulations. It was easier to estimate the amount of a drug that would be sold in the entire foreign market than to estimate in which specific country or in which package size it would be sold. However, the export requirements, to the extent predictable, were considered together with the domestic requirements in setting production.
*714 43. Under the method of intercompany pricing described in findings 8 and 24, supra,, Eli Lilly made the following sales to International during the years in issue:

Schedule of Sales and Costs on Business with Eli Lilly International for years indicated

Eli Lilly billed International for its sales to the latter on a monthly basis. Copies of International’s and Pan-American’s shipping documents were furnished to Eli Lilly each month, and those documents showed the value of the products shipped in terms of domestic net trade prices.[7] For the first eleven months of the year the sales figures on these documents were totaled and a discount applied thereto which was intended to reduce the total to approximately manufacturing cost plus third-party royalties plus allocated operating expense.[8] The resultant figure was posted monthly as a receivable by Eli Lilly and a payable by International.
For the purpose of the final month’s intercompany billing at the end of each year, Ely Lilly’s accountants calculated its actual recorded manufacturing costs for goods sold during the entire year to International, the amount of royalties thereon paid or payable to third parties, and the amount of operating expenses determined to be attributable to inter-company volume for the year. They then computed the percentage figure which, when multiplied by the total net trade prices (taken from Eli Lilly’s domestic trade catalogue) for all goods sold to International during the year, would produce a product equal to the then known total of said manu- *715 factoring costs, third-party royalties, and allocated operating expenses. At this point, Eli Lilly knew that, in order to recover the total of said costs, royalties, and operating expenses, it must charge International a price at least equal to said percentage, computed as stated, of the total domestic prices applicable to all the goods sold to International during the year, and the twelfth-month billing was adjusted so as to recover the difference between the total of the prior eleven months’ billings and the actual costs as finally computed for the entire year. The percentage figure so determined was rounded off to a full percent and recommended to management as the final discount figure for the year. Such “rounding off” process produced the figures shown in the table above under the column headed “Excess of Sales over Costs and Expenses.”
44. Under the method of pricing and allocation described in finding 9, supra, International made the following sales to Pan-American during the years in issue:

International Schedule of Sales and Costs on Business with Pan-American

The monthly billing of Pan-American by International during the years in issue was computed as follows. International kept a copy of all shipping orders covering Pan-American’s shipments and from them it priced the included items at International’s cost from Eli Lilly. To this amount was added a portion of its expenses (other than the cost of its sales representatives in the Eastern Hemisphere) based on the three-factor formula described in finding 9, supra.
*716 45. Neither International nor Pan-American had any warehouses or any inventory other than goods in transport. Goods ordered by their customers were shipped directly from the inventories of Eli Lilly. In the distribution of Lilly products, both within and without the United States, warehousing of those products, insofar as it was a function of distribution and selling, was performed exclusively by the wholesale distributors.
When a wholesale distributor in the Western Hemisphere placed an order for drugs from Pan-American, the order was directed to International’s offices in Indianapolis.[9] The order was registered, given a number, translated into English, and placed on a shipping order form which had numerous duplicate copies. Then an acknowledgment letter was forwarded to the wholesale distributor informing him of the approximate arrival date for the shipment. A copy of the shipping order was sent to Eli Lilly’s Export Shipping Department, the entire cost of which department, including fixed charges, was allocated to International as a part of allocable operating expenses. That department processed the order in its entirety, and when the order had been filled, the department returned it to International which, in turn, prepared all shipping documents, collection papers,[10] and customs papers. Transportation was arranged by International’s Traffic Department.
One copy of the shipping order was sent to Eli Lilly’s Cost Department which used it to bill International for goods shipped as explained in finding 43, supra. International used still another copy of the shipping order to bill Pan-American, as explained in finding 44, supra.
During the years in issue, Lilly products were also sold by International or Pan-American to other subsidiaries of Eli Lilly at prices computed as follows:

*717
Subsidiary

Lilly of Argentina-Lilly of Brazil_ Lilly of Mexico_ Lilly of India (no bulk sales to India). Domestic net trade price* less 15% and 7% for finished merchandise; cost plus 40% for bulk** merchandise.
Lilly of Canada_ Fair market value or sales price of merchandise of like kind and quantity in the United States market on finished merchandise (Canada has an anti-dumping duty) ; fair market value or cost plus 75% on bulk** merchandise; fair market value or cost plus 50% on semi-processed chemicals; fair market value or cost plus 20% on raw chemicals.
Lilly of England_ Domestic net trade price less 30% on finished merchandise; cost plus 40% on bulk** merchandise.
46. During the years in issue, the fixed costs of Eli Lilly which were a part of its total manufacturing costs of goods sold to International were as follows:

Total Manufacturing Costs, Fixed Costs and Fixed Costs Percentage of Total Manufacturing Costs on Sales to Eli Lilly International

In the context of the operations of Eli Lilly, fixed costs are determined to be those costs which are a function of time and not a function of units produced. As a matter of accounting practice these costs are generally spread for the accounting period over the units produced in some equitable manner, perhaps by man-hour measurement, perhaps by machine-hour measurement or some other equitable base in terms of accounting. There are certain costs of Eli Lilly such as depreciation, taxes on property, and certain costs relating to property maintenance and minimum repair which *718 do not vary with the volume of units produced. Such costs are typical illustrations of “fixed costs.”
Other costs of Eli Lilly, such as the material that goes into the product, the bottle that contains the product, the label that identifies the product, the case in which the product is packed, are all variable with the number of units produced, that is, these costs are spread over the units produced. In the same manner, direct labor that is spent to change the form or appearance or the texture of a product is also directly variable with the number of units produced. These types of costs are known as “variable costs.”
In addition there are elements of cost that do not vary directly in proportion to production. Some of these might be in the nature of certain supplies and maintenance costs. In any determination of which costs are fixed and which are variable, judgment, experience, and access to the detailed records of expenses and costs, plus a knowledge of the methods used in producing the products and of the personnel that are used in the production areas, are essential. Hence, a determination of fixed costs is a calculation based upon judgment.
The computation of fixed costs on sales to International during the years in issue, set forth in the above schedule, was prepared by a team of leading Eli Lilly accountants, one of whom had 38 years of accounting service with Eli Lilly and none of whom had less than 9 years of such service.
47. The fixed cost concept in determining unit costs at varying levels of production may be illustrated by the following example using hypothetical figures:

*719 Hence, it will be noted that if tbe plant is operated at 100 percent capacity, even though the average cost per unit on the 200,000 units produced is 95y2 cents, insofar as the production increment of 50,000 units is concerned, any sale of those units in excess of 67 cents will produce a profit thereon. This is the theory used in pricing products for a marginal market when regular business does not require full manufacturing capacity. It was the theory used by Eli Lilly in bidding for Defense Procurement Agency contracts throughout the period in issue. Thus, Eli Lilly’s total cost (fixed and variable) to produce a 10 cc. vial of Duracillin was 19 cents. It sold this product to its regular wholesalers for 44 cents, but by use of the fixed cost concept described above, it was able to sell large quantities of the same product to the United States Government and to quantity wholesalers for prices ranging between 16 and 18 cents per unit.
48. Thus, Defense Procurement Agency contracts and the bulk industrial market represented what the president of Eli Lilly called a “safety valve in handling our costs.” When Eli Lilly had surplus capacity, it utilized that capacity by bidding low for Defense Procurement Agency contracts and industrial contracts. During the years in issue, Eli Lilly’s bulk sales of pharmaceutical and biological products to industrial and agricultural customers and to the Defense Procurement Agency totaled almost 20 million dollars, as may be seen by the following schedules:

Pharmaceutical and Biological Bales, Manufacturing Costs and Percentage Markup to United States Defense Procurement Agency

*720
Pharmaceutical and Biological Sales, Costs and. Percentage Markup of Eli Lilly & Company’s Agricultural and Industrial Division

Although the foregoing schedules demonstrate the substantial nature of this type of business, and although Eli Lilly continually bid for Government business, the president of the company referred to bulk sales to the Government as “casual” in distinguishing them from the more regular and continuing sales made in the foreign market. Such bulk sales comprised products similar to those sold to International. They differed, however, in that most sales to International consisted of orders packaged in small quantities with the Lilly trademark affixed (International bore the cost of such packaging) , whereas the above described bulk sales were generally contained in large drums without trademarks. Only in the case of Government and industrial bulk sales did Eli Lilly produce products for a specific contract, and it seldom made much money from that market. Eli Lilly could not stay in business as a manufacturer of pharmaceuticals if it had to depend on the profits made in such marginal markets.
Luring the years in issue, Eli Lilly also made sales to the United States under General Services Administration contracts on a basis comparable to sales to its domestic wholesalers, and orders and deliveries on such contracts were made through the domestic wholesalers. The regular GSA Government business and industrial business of Eli Lilly were tailored into its production planning. The foreign business likewise was tailored into production planning in that Eli Lilly planned for International’s expected requirements. Defense Procurement Agency business, on the other hand, was not so tailored into production planning but, as explained *721 above, was handled on a contract-to-contract basis. However, Eli Lilly computed its manufacturing costs on Defense Procurement Agency and industrial sales (column three of schedules immediately above) in the same manner as it computed its manufacturing costs on sales to International (column three of schedule in finding 43, supra).
49. In the opinion of Eli Lilly’s chief accounting officer, the total incremental profit to Eli Lilly contributed by the export business for the six years in issue was $11,398,421. This figure is simply the total of “Fixed Costs” shown in the schedule contained in finding 46, supra, plus the total of “Excess of Sales over Costs & Expenses” shown in the schedule contained in finding 43, supra. Although Eli Lilly’s boohs of account showed only the “Excess of Sales over Costs & Expenses” as its profit before taxes on the International sales, the chief accounting officer believed that, in an economic sense, it was necessary to add thereto International’s share of Eli Lilly’s fixed costs in order to arrive at the actual profit of Eli Lilly attributable to the export sales. A part of his judgment in this respect was based on his conclusion that Eli Lilly had facilities and produption capacity in excess of its needs during most of the period involved. He had in mind particularly Eli Lilly’s Tippecanoe antibiotic plant, the erection of which in the early 1950’s was encouraged by the United States Government in anticipation of the need for antibiotics for the Korean conflict. Because it was not needed, this plant was closed down after it was constructed at a maintenance cost to Eli Lilly of more than a million dollars a year. In the fall of 1953, however, it appears that the Executive Committee of Eli Lilly began to consider utilization of the Tippecanoe plant and in connection therewith agreed that antibiotics could be sold to foreign governmental units, agencies of the United Nations, and foreign buying commissions at prices not less than Eli Lilly’s out-of-pocket costs without overhead.
50. The following schedules, with self-explanatory headings, have been included herein as an aid to understanding *722 the overall intercompany arrangements among Eli Lilly, International, and Pan-American during the years in issue:

"Percentage of Goods Manufactured 'by EM Lilly & Company Sold to EM Lilly International

Net Profit Earned "by Eli Lilly & Company on all Sales Other Than to EM Lilly International

US$ (000's Omitted)

Net Profit Earned by Eli Lilly International Corporation on all Sales Other Than to EM Lilly Pan-American Corporation

US$ (000’s Omitted)

*723
Net Profit Earned by Eli Lilly Pan-American, Corporation on all Sales in the Western Hemisphere

US$ (000’s Omitted)

From the last three schedules reproduced immediately above, it will be noted that with respect to all sales other them mtercom'pcmy sales, all three companies earned approximately the same net profit when expressed in terms of a percentage of sales. Such similarity would appear to be normal in view of the above described cost-oriented intercompany pricing policy coupled with the fact that the Lilly export pricelist was approximately the same as its domestic price-list. See findings 24 and 37, supra.
51. As previously stated in finding 8, supra, Eli Lilly did not include in its costs to International any significant amount of its expense for research and development. See finding 60, infra. However, Eli Lilly has spent sizable amounts of money on extensive programs for research and development and is currently spending thereon 10 percent of its sales dollar. In fact, research and development has been the basis of Eli Lilly’s growth as well as that of its competitors. The reason it spends so much money on research and development is that from 40 to 45 percent of its total sales volume historically comes from products introduced in the last five years and about 70 percent from products introduced in the past ten years. There is a high rate of obsolescence of products in the pharmaceutical industry.
*724 For example, during the period in issue Eli Lilly- deveh oped the Salk polio vaccine. It began work in 1953 and by 1955 had produced a satisfactory vaccine which was immediately licensed by the United States Department of Health. Because Eli Lilly had developed more knowledge and more skill in certain scientific procedures connected with the manufacture of the vaccine than had its competitors, it produced 75 percent of the total vaccine used during the first couple of years it was on the market.
In undertaking to develop Salk-polio vaccine, Eli Lilly took a substantial risk in that there was a possibility of a terrible tragedy occurring from the use of such a potent product as virulent polio virus, and there were years of great financial investment before the developed product could be licensed to be sold. On the other hand, there was a period of considerable profit for two or three years after the product was introduced to the market. Since that time obsolescence has'taken-place.. . • -
52. The income tax returns for the years 1952 through 1957 of Eli Lilly, International and Pan-American were examined by. the Internal Revenue Service in two separate audits. The first audit covered 1952, 1953, and 1954, and the second audit. covered 1955.; 1956,- and. 1957. As a result of these audits, the Commissioner of Internal Revenue increased the taxable income of Eli Lilly in the years 1952 through 1957, by increasing its selling price for goods which it sold to International in the following amounts: :
1952"____LLi______1_1 — — $436, 717. 06
1953_,__ 1, 049, 846. 78
1954:_i__,1_A___ 1,002,122.34
195,5_,._ 937, 822. 30
19,56_,_ 1, 748,019.37
1957_!___'_ 1, 692,470.23
53. The same Internal Revenue agent conducted both audits , referred to, in the, preceding finding. The first thing he did was to make comparative income and related studies as between Eli, Lilly,. International, Eind PanrAmerican. From .these studies he noted .that Eli Lilly’s sales to its domestic wholesale distributors were producing profits con-. *725 siderably in excess of proiits from its sales to International, and that most of the profits on sales of Lilly products in the Western Hemisphere (other than in the United States) were being realized by Pan-American. He concluded that this had resulted from a pricing policy of Eli Lilly which appeared to him to accumulate an unduly large amount of profit in Pan-American, a corporation entitled to the benefits of the Western Hemisphere trade corporation provisions of the Internal Revenue Code. He believed such policy was in conflict with section 482, the regulations issued thereunder, and Revenue Ruling 15, 1953-1 C.B. 141. Consequently, following what he deemed to be the applicable law, he undertook to determine in what amount Eli Lilly’s prices would have been if the sales of its merchandise to International had been made at arm’s length. During the course of his audits, the agent conferred on numerous occasions with Eli Lilly’s representatives. They were in complete disagreement with the agent and contended that no inter-company reallocation was proper or permissible under the applicable law as they understood it. While they were cooperative with the agent in making available all material and information requested by him, they criticized all his approaches and proposed methods of allocation as unbusi-nesslike and unwarranted. They proposed no revised inter-company allocation of their own but stood firmly on the correctness of their existing pricing policies. They continue to do so.
.54. Having decided that section 482 required an allocation of income and deductions among Eli Lilly, International, and Pan-American, the Internal Revenue agent determined to make such allocation by an indirect approach. Rather than making a direct allocation of gross incomes, deductions, credits or allowances among the three corporations, he decided to apply to the cost of goods sold by Eli Lilly to International a markup, or profit percentage, computed from Eli Lilly’s experience with its domestic sales which he considered to be arm’s-length sales. In determining such markups, he made the basic assumption that each dollar of cost of goods sold and each dollar of expense were equally *726 productive, and that the same profit earned on domestic expense dollars should be earned on foreign trade expense dollars. In recognition, however, of the fact that International represented one very large customer, as contrasted to many relatively smaller domestic customers, he simply applied one-half the markup, or profit percentage, experienced in domestic sales to the cost of goods sold to International. However, he applied the full percentage to the allocated expenses. The agent made some allowances in Eli Lilly’s favor for years which appeared to have unusual circumstances, as explained below.
55. The following steps describe the agent’s actions in arriving at the aforesaid profit percentages, which, when multiplied by cost of goods sold to International, produced the amounts of income which he believed should be shifted, or allocated, from International to Eli Lilly for the years 1952, 1953, and 1954:
(a) The sales of Eli Lilly were divided between domestic sales and international sales.
(b) The expenses of Eli Lilly were divided between those expenses referable to domestic sales and those referable to international sales as disclosed on the books and records of EliLilly.
(c) After separation of the expenses referable to domestic sales and to international sales, the expenses of Eli Lilly were further divided into two categories: Category 1 expenses included cost of goods sold, administration expenses, and interest on borrowed money. Category 2 expenses included scientific research, product development, loss on sale of crude stock, loss on abandonments, moving expenses, factory losses, amortization of emergency facilities, and idle plant costs, all cumulatively called “other manufacturing expense,” and, in addition, loss on merchandise returned, merchandizing expenses, sales expenses, shipping expenses, and miscellaneous other expenses. From category 2 expenses were deducted amortization on emergency facilities and idle plant costs.
(d) The total expenses under both category 1 and category 2 referable to domestic sales of Eli Lilly as shown on its books and records amounted to $74,550,448.01 in 1952, to $78,- *727 418,365.59 in 1953, and to $77,761,904.75 in 1954. These amounts were subtracted from Eli Lilly’s domestic sales to arrive at its net income on domestic sales before dividends, taxes, and other income. The resultant net income figures amounted to $17,260,332.50 for 1952, to $21,691,829.73 for 1953, and to $19,057,298.97 for 1954.
(e) The ratio of such net income to total expense in the year 1952 was 23.15 percent; in 1953 the ratio was 27.66 percent ; and in 1954 it was 24.51 percent.
(f) The total category 2 expenses referable to the sales to International were then multiplied by the ratios of 23.15 percent in 1952, 27.66 percent in 1953, and 24.51 percent in
1954. However, the total category 1 costs and expenses referable to the sales to International were then multiplied by only 4 percent in 1952, by 13.83 percent in 1953, and by 12.26 percent in 1954. Thus, while the entire ratio percentages were applied to category 2 expenses, only one-half the ratio of net income to total expense in each year was applied to category 1 expenses, except that only 4 percent was applied to category 1 expenses in 1952. The reasons given by the agent for such reductions in the ratios are explained in finding 56, infra.
(g) These two computed amounts (designated by the agent as “Profit to be Earned”) plus the allocated operating expenses shown on the boohs and records of Eli Lilly equaled 17.91 percent of its cost of goods sold on sales to International in 1952, 28.37 percent in 1953 and 27.79 percent in 1954. These percentages were rounded off to produce markups of 18 percent for 1952 and 28 percent for 1953 and 1954. These markups were multiplied by the cost of goods sold to International as shown on the books and records of Eli Lilly for the respective years indicated. The resultant figures were allocated to Eli Lilly through the mechanism of adding equivalent amounts to Eli Lilly’s sales to International for the respective years, thus increasing Eli Lilly’s income from sales accordingly.[11]
*728 The following schedules prepared by the agent reflect the detailed mathematical computations applying the steps described above for the years indicated:

*729

*730

56. It is pointed out in finding 55(f), supra, that in arriving at his final ratios of net income to expense for application to International’s expenses the agent made certain downward adjustments. While he consistently applied his original ratio to category 2 expenses, insofar as category 1 expenses were concerned he applied thereto only 50 percent of the original ratio in 1953 and 1954, and for 1952 he slashed the ratio nearly 20 percentage points. In explaining the 1952 reduction he testified that he felt it necessary to take into account the fact that in 1952 Eli Lilly was unable to sell streptomycin at a profit (see finding 23, supra), and he found that any percentage in excess of four percent resulted in a loss by International on *731 its sales in the Eastern hemisphere. In explaining his 50 percent reduction of the ratio for the years 1953 and 1954, the agent explained that this was intended to reflect an adjustment for the fact that International was one large customer to whom Eli Lilly could 'be expected to sell at a lower profit than to its numerous domestic wholesalers.
In his testimony, the agent appeared to be aware that the above generalizations in no way explained how he arrived at the precise reduced percentages which he used. On numerous occasions during his testimony he referred to the reductions as having been the result of negotiations and agreements with Eli Lilly’s representatives during the audit period. The record in this case clearly shows that during 1955,1956, and 1957, Eli Lilly’s representatives, the Internal Eevenue agent, and his supervisors participated in numerous conferences and that earnest efforts were made on both sides to arrive at a settlement of their differences. It may be properly inferred that, in the course of bargaining at the conference table, tentative concessions were made by each side for the purpose of determining the amount of tax dollars involved in such concessions as contrasted to the anticipated expense and trouble incident to litigation. However, the evidence in this record is clear that at no time did Eli Lilly, or any of its representatives, agree with the agent or any other representative of the Internal Eevenue Service that his method of allocating income to Eli Lilly was a correct or proper method. The agent misconceived the nature of the settlement negotiations.[12] On this record it cannot be said that they ever attained the stature of agreements.
57. For the year 1955, using the same method described in finding 55, above, the agent arrived at a markup of 32.38 percent. However, after discussing the matter with Eli Lilly’s representatives, he arrived at the conclusion that the oper *732 ating experience of the three, corporations in, 1955 was not significantly different from their experience in 1953 and 1954. Accordingly, he decided to use the same markup for all three years, namely, 28 percent. . ...
58. In the years 1956 and 1957, the agent determined markups of 36 percent and 30.5 per cent, .respectively, in the following manner
(a) A computation was made of the .ratio of the gross profit to the cost of goods sold of International on all of its sales- other, than to Pan-American for the years 1953 and 1954. The markup percentages on-these sales were 103.335 percent in 1953 and 92.016 percent in 1954.
, (b:) A computation, was made.,of the. ratio of the, .gross profit to cost, of goods sold of International on all of its sales other than to, Pan-American for the years 1956 and 1957. The markup percentages on these sales were 123.746 in 1956 and 104.795 in 1957.
(c) A weighted average, of such markup percentages for the y.pars .1953 and 1954 was computed, to, be 96.135 percent.[13]
(d) A computation was then made of the percent increases in such markup percentages in 1956 and 1957 over- the weighted average, markup for .the years 1953 and 1954. The percent increases over the weighted average were 28.721 in 1956 and 9.008 in 1957.[14]
(e) As previously stated, the. cost of, goods sold by Eli Lilly to International was marked up by 28 percent in the years 1953 and 1954. This 28 percent-markup was increased for 1956 by the percent increase hi International’s markup on cost of goods sold hi 1956 of 28.721. Applying this percentage increase (28.721) to the 28 percent markup, used in , 1953 and. 1954 resulted in a markup percent of 36.042. A 36 percent markup on Eli Lilly’s cost of goods sold was actually used,by the agent in 1956.
*733 (f) The 28 percent markup used in 1953 and 1954 was increased for 1957 by the percentage increase in International’s markup on cost of goods sold in 1957 of 9.008. Applying this percentage increase' (9.008) to the , 28 percent markup used in 1953 and 1954 resulted in a markup percent of 30.522. A 30.5 percent markup on Eli Lilly’s cost of goods sold was actually used by the agent in 1957.
The agent’s computation in determining the markup of 36 percent in 1956 and 30.5 percent in 1957 was as follows:

59. The three charts which follow show for the years 1952-1957, with respect to Western Hemisphere sales only, (1) the relative book profits of - Eli Lilly and its two subsidiaries, International and Pan-American; (2) the relative profits of each after adjustments made by the Internal Revenue Service; and (3) the book profits of each relative to its costs and expenses attributable to such sales.

*734

*735

*736

*737 60. If research and development expense had been allocated on the basis of sales made to International in the years 1955 through 1957, this adjustment alone would have resulted in a markup on cost of goods sold in those years of 29.50 percent in 1955, 32.01 percent in 1956, and 31.58 percent in 1957.
Comparing the net profits (as shown on their Federal income tax returns for only the years 1953 through 1957) of Eli Lilly and Pan-American as a percent of their total assets, Eli Lilly’s net profits were 24 percent of its total assets and Pan-American’s net profits were 40 percent of its total assets. Comparing the net profits of Eli Lilly and Pan-American as a percent of their net worth for the same period, Eli Lilly’s net profits were 33 percent of its net worth, and Pan-American’s net profits were 54 percent of its net worth.
61. Eli Lilly received and reported in its income tax returns the following dividends from International and Pan-American during the years in issue:

However, it deducted 85 percent of such intercorporate dividends from its taxable income, as it was entitled to do under the Internal Eevenue Code. See, for example, section 243, Internal Eevenue Code of 1954.
CoNClusioN of Law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover and its petition is dismissed; on its petition filed on July 26,1961, and the case is remanded to the trial commissioner for further proceedings on plaintiff’s motion to amend the petition.*

 Amended pursuant to Order dated February 28, 1967.

 The opinion, findings oí fact and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

 Section 45 of tie Internal Revenue Code of 1939, as amended (26 U.S.C. 1952 ed., See. 45), applicable to the years 1952 and. 1953, is substantially the same as section 482 of the 1954 Code quoted above.

 It manufactures and sells nearly 1,000 different products. Primarily, they comprise what are known as “ethical” drugs which are those sold to the ultimate consumer on prescription only. This tends to make Eli Lilly a comparatively high-cost manufacturer.

 Not long thereafter, Mi Lilly also organized other -wholly-owned subsidiaries to operate specifically In Mexico, Argentina, and Brazil. Previously, it had organized subsidiaries in England and Canada,

 The regulation promulgated under section 45 of the 1939 Code was substantially the same. See Treas. Reg. 118, Sec. 39.45-1.

 The agent also made some other adjustments to the percentage figures for years which appeared to have unusual circumstances such as 1952 when Ell Lilly was experiencing production difficulties with streptomycin. The full details are set forth In findings 55 and 56, infra.

 It is obvious, for example, that in selling at arm’s length to an unrelated purchaser, Eli Lilly’s price properly would reflect the company’s very substantial research and development costs. ¿This was not so, however, in pricing to International. See findings 8, 51, and 60. Eli Lilly’s assertion that this was due to the fact that its research and development costs would have been the same even without the foreign markets is not a convincing reason for ignoring the arm’s-length criterion of the regulations. Compare John V. Carr & Sons, Inc. v. United States, 52 CCPA 62 (C.A.D. 860, 1965) in which the question was whether prices by a Canadian manufacturer to a United States subsidiary, for export to the U.S., fairly reflected market value for U.S. customs purposes. Prices in the Canadian home market were higher but the difference was explained as due to allocation of various fixed charges and overhead to the home market entirely, the export market being considered marginal. The court held, two judges dissenting, that the involved export sales did not fairly reflect market value.

 “Ethical” drugs, generally speaking, are those which can be purchased by the consumer only on prescription.

 There appears to have been no tax motivation involved in setting the transfer price to Eli Lilly and Company, Limited, since the tax rate in the united Kingdom was higher than the tax rate in the united States at that time.

 The export sales o£ the Eastern Hemisphere Division and the Western Hemisphere Division in the year 1942 were $727,282 for the Eastern Hemisphere and $2,648,975 for the Western Hemisphere for a total in export sales for that year of $3,376,257.

 The risk of expropriation was realized by Pan-American in Cuba in the year 1960, when the entire drug industry there was expropriated. The loss through receivables alone to Pan-American in the year 1960 as a result of the Cuban confiscation was $375,000. This factor contributed to the very small profit realized by Pan-American in the year 1960. In 1960, even though sales were made on the same basis as during the years 1952 through 1957, the Internal Revenue Service did not adjust the transfer price of merchandise sold by Eli Lilly to Pan-American.

 As a motivation factor, sales quotas had been established for the export market in about 1943 and continued to be used in export throughout the years in issue.

 If an item in packaged form had not experienced sales in four months of the previous twelve, it was not carried in finished form by taxpayer, that is, it was a “non-carried” item. In that case a reserve of finished pills, capsules, ampules, and the like, in large drums but not in packaged form, was held in inventory ready for packaging. This inventory reserve was referred to as *713 “bulk” Inventory. When an order was received, a packaging order was issued, and taxpayer went to Its bulk reserve inventory and bottled for that order. That was not an unusual occurrence In foreign orders because of the variety in package sizes and labeling requirements. Some countries require even the name of the registered pharmacist who is going to dispense the drug to be entered on the label.

 See finding 37, supra.

 The discount figure used during these first eleven months, -while approximately accurate, was necessarily tentative since exact cost figures were not known until the close of the year.

 Also, some Eli Lilly products were sold -within the united States to brokers for shipment abroad. These sales, regardless of whether their ultimate destination was the Eastern or Western Hemisphere, were made by International because they were destined for export even though sold within the united States.

 The number of days required for payment by the purchasers from International and Pan-American varied from immediate payment to 180 days.

 “Domestic net trade price” means the suggested price to the retailer in the united States.

 “Bulk” means finished merchandise that has not been packaged.

 By the same token, of course, the result of this allocation was to Increase the cost of goods purchased by International from Ell Lilly which, in turn, by reason of the intercompany arrangements described in finding 9, supra, would increase Pan-American’s cost of goods purchased from International. Thus, the effect of increasing Eli Lilly’s sales income was to reduce Pan-American’B.

 At one point in his testimony, it is possible to infer that the agent considered the execution by Eli Lilly of a waiver of restrictions on assessment (Form 870) to constitute an “agreement” to his adjustments. This, of course, is not so since the form, by its wording, precludes any such result.

 The weighted average of 96.135 was computed by dividing the sum of the gross profits for the years 1953 and 1954 by the sum of the cost of goods sold during those same years. ' .

 The percent increases were computed by dividing the difference between the markup percent and the weighted average by the weighted average. To illustrate for the year 1956 (see table below) the fraction would be: ‘ 123.746^96.135 =28-721

 Amended pursuant to Order dated February 28, 1967.